# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 23-115


**STATE OF LOUISIANA**

**VERSUS**

**DAVID ANTHONY BURNS**


**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 351930
HONORABLE MARY LAUVE DOGGETT, DISTRICT JUDGE

**********

**GARY J. ORTEGO**
**JUDGE**

**********

Court composed of D. Kent Savoie, Jonathan W. Perry, and Gary J. Ortego, Judges.


**CONVICTION AND SENTENCE AFFIRMED.**

**Hon. Phillip Terrell, Jr.**
**District Attorney**
**Ninth Judicial District**
**P. O. Box 7358**
**Alexandria, La 71306-7358**
**(318) 473-6650**
**COUNSEL FOR APPELLEE:**
**State of Louisiana**

**Hugo A. Holland  Jr.**
**Assistant District Attorney**
**Ninth Judicial District**
**P.O. Box 5974**
**Shreveport, LA 71135**
**(318) 464-5902**
**COUNSEL FOR APPELLEE:**
**State of Louisiana**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**P. O. Box 2125**
**Lafayette, LA 70502**
**(225) 806-2930**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**David Anthony Burns**

**David Anthony Burns**
**Louisiana State Prison**
**Falcon 2 Tunica Trace 17544**
**Angola, La 70712**
**DEFENDANT/APPELLANT**

**ORTEGO, Judge.**

In this criminal case, Defendant, David Anthony Burns, appeals his conviction of second-degree murder, in violation of La.R.S. 14:30.1(A)(1) and (2). The central issue presented is whether the State offered sufficient evidence to support Defendant's second-degree murder conviction, over fifteen years after the murder occurred, with the evidence tying Defendant to the crime being almost entirely circumstantial. For the following reasons, we affirm Defendant's conviction and sentence.

## PROCEDURAL HISTORY

On April 13, 2021, Defendant, David Anthony Burns, was charged by bill of indictment with second degree murder, in violation of La.R.S. 14:30.1(A)(1) and (2). On November 23, 2021, defense counsel filed a "Motion to Suppress" an out-of-court identification, arguing that the lineup and identification procedures used by the police were suggestive and produced a substantial likelihood of misidentification. The trial court denied the motion after finding the arguments raised therein addressed the weight of the evidence. On January 24, 2022, Defendant filed a "Motion to Quash with Incorporated Memorandum," wherein he argued Rapides Parish was an improper venue for trial because it was unknown where the homicide occurred and because the victim's body was found in Texas. On April 11, 2022, the trial court denied the motion following a hearing, and this court denied Defendant's supervisory writ application. *State v. Burns*, 22-416 (La.App. 3 Cir. 7/17/22) (unpublished opinion).

On October 25, 2022, Defendant's trial commenced with jury selection. After resting its case-in-chief, the State amended the bill of indictment to charge Defendant with the offense of second-degree murder, in violation of La.R.S.

14:30.1(A)(1), with the specific intent to kill or inflict great bodily harm. On October 31, 2022, the jury unanimously found Defendant guilty as charged.

On November 21, 2022, Defendant filed a "Motion for Judgment of Acquittal or Alternatively for a New Trial" and a "Motion for New Trial." Both motions were denied. On November 29, 2022, Defendant was sentenced to the mandatory term of life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. The trial court granted Defendant an appeal, and he is now before this court alleging there was insufficient evidence to sustain his conviction for several reasons.

## FACTS

On Monday, October 4, 2004, the semi-nude and decomposing body of nineteen-year-old Courtney Coco was found in an abandoned building on Farm to Market Road 1406 ("FM 1406") near Interstate 10 in Winnie, Texas. Coco was a resident of Alexandria, Louisiana, and had last been seen alive at approximately 4:30 a.m. on Saturday, October 2, 2004. Despite numerous leads in the investigation, the case went cold. Fifteen years after Coco's body was discovered, the police arrested Defendant, who had been engaged to Coco's sister in 2004, for her murder. Defendant proceeded to trial, and, after ninety minutes of deliberation, a Rapides Parish jury unanimously found him guilty of second-degree murder.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## ASSIGNMENT OF ERROR

In his sole assignment of error, Defendant asserts:

> The evidence was insufficient to prove David Anthony Burns was guilty of Second-Degree Murder. Experts hired by the State questioned whether a homicide even occurred, instead opining that Courtney Coco died of an accidental overdose. Further, after nearly two decades as a cold case, the State's evidence amounted to the "identification" by a witness that Anthony Burns looked like a person at the location where Ms. Coco was later found dead. The State also claimed Anthony "confessed" to being involved in Ms. Coco's death and/or dumping her body.

## LAW AND DISCUSSION

The relevant standard of review when assessing the sufficiency of the evidence is as follows:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La. 1981). It is the role of the fact finder to weigh the respective credibilities of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See Graffagnino*, 436 So.2d at 563, *citing State v. Richardson*, 425 So.2d 1228 (La.1983). To obtain a conviction, the elements of the crime must be proven beyond a reasonable doubt.

*State v. Freeman,* 01-997, pp. 2-3 (La.App. 3 Cir. 12/12/01), 801 So.2d 578, 580.

> Furthermore, the testimony of a single witness is sufficient to support a conviction "[i]n the absence of internal contradiction or irreconcilable conflicts with physical evidence." *State v. Dixon,* 04-1019, p. 12 (La.App. 5 Cir. 3/15/05), 900 So.2d 929, 936. The trier of fact may accept or reject the testimony of any witness, and the determination of the credibility of that witness, in whole or in part, is

left to its sound discretion and "will not be re-weighed on appeal." *Id.* at 936.

*State v. F.B.A.*, 07-1526, pp. 1–2 (La.App. 3 Cir. 5/28/08), 983 So.2d 1006, 1009, *writ denied,* 08-1464 (La. 3/27/09), 5 So.3d 138.

As for appellate review in cases relying on circumstantial evidence, this court has stated the following:

> When the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that the state "must exclude every reasonable hypothesis of innocence" in order to convict. *State v. Camp*, 446 So.2d 1207, 1209 (La.1984). "Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common sense." *State v. Burns*, 441 So.2d 843, 845 (La.App. 3 Cir.1983). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded. *State v. Williams*, 13-497 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024.

*State v. Baumberger*, 15-1056, pp. 10–11 (La.App. 3 Cir. 6/1/16), 200 So.3d 817, 826–27, *writ denied*, 16-1251 (La. 5/26/17), 221 So.3d 859, *cert. denied*, ___ U.S. ___, 138 S.Ct. 392 (2017).

Louisiana Revised Statutes 14:30.1(A)(1) defines second degree murder as "the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). "Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant." *State v. Draughn*, 05-1825, pp. 7–8

4

(La. 1/17/07), 950 So.2d 583, 592–93 (citations omitted), *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537 (2007).

Louisiana Revised Statutes 14:24 defines a principal as: "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals."

> Only those persons who knowingly participate in the planning or execution of a crime are principals to that crime. An individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state, and the mental state of one defendant may not be imputed to another defendant. Thus, mere presence at the scene of a crime does not make one a principal to the crime. However, it is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's intention. *State v. Page*, 08–531 (La.App. 5 Cir. 11/10/09), 28 So.3d 442, 449, *writ denied*, 09–2684 (La.6/4/10), 38 So.3d 299.

*State v. Petty*, 12-278, p. 11 (La.App. 5 Cir. 10/30/12), 103 So.3d 616, 623.

The State is required "to negate any reasonable probability of misidentification" when the key issue in a case is the defendant's identity. *State v. Hughes*, 05-992, p. 5 (La. 11/29/06), 943 So.2d 1047, 1051 (citing *State v. Weary,* 03-3067 (La. 4/24/06), 931 So.2d 297, *cert. denied*, 549 U.S. 1062, 127 S.Ct. 682 (2006); *State v. Neal*, 00-674 (La. 6/29/01), 796 So.2d 649, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323 (2002)). However, "[p]ositive identification by only one witness is sufficient to support a conviction. It is the factfinder who weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations." *Id.* (citations omitted).

*Evidence Presented at Trial*

This matter and these charges are primarily fact driven. Therefore, our review of the factual evidence accepted and presented to the jury, although extensive, laborious, and sometimes repetitive in this opinion, is vital for a thorough and complete analysis of the complex and interwoven issues presented in this appeal.

We now set forth the evidence presented at trial, noting also at the outset that the jury was confronted with contradictory and conflicting testimony and was, consequently, called upon to resolve several factual disputes.

The first witness to testify at trial was Waylon Durison. At the time of trial, Durison was living in a homeless shelter in Missouri, where he was arrested and transported to Louisiana for him to testify. Durison testified that he had known Defendant for twenty-five to thirty years. In May 2011, Durison had a conversation with Defendant on the subject of killing. Durison told Defendant he did not think he could ever kill someone, and Defendant responded by saying, "[I]t ain't as hard as you think[.]" Defendant then told Durison about someone he had killed by smothering them and said he hauled the body somewhere to dump. Durison thought Defendant said he smothered the person with a pillow "or something like that." Durison testified that Defendant said he wrapped the body in a blanket, and he thought Defendant dumped the body in Texas. Defendant mentioned Coco's name and said the blanket was Coco's. Durison thought Coco was Defendant's girlfriend or girlfriend's sister. Durison reported the conversation to the police immediately thereafter and gave a taped statement. According to Durison, Defendant was worried that Chris Clark, their mutual friend, might provide information to the police.

On cross-examination, Durison admitted that he had been convicted of theft on several occasions. Durison did not know what color the blanket was or who the blanket belonged to, but he thought the blanket might have belonged to Coco. Defense counsel questioned Durison about his prior statement to police in which he said Defendant and Lace Evans, Coco's sister, killed Coco to get insurance money from her. In his prior statement, Durison also said Coco was wrapped in "his" blanket, but Durison testified the blanket was "hers." Durison told police Evans was involved in Coco's murder. Durison denied that his history of drug use affected or impaired his memory. On redirect, Durison testified that Defendant never said Evans killed Coco, but that Defendant said Evans was involved in something to do with the money. Durison said he had no reason to lie.

Skylor Hearn was an investigator with the Texas Rangers in 2004. On October 4, 2004 Hearn received a call from the Chambers County Sheriff's Office ("CCSO") requesting assistance with an unidentified body that was discovered in an abandoned building. Hearn testified the body was nude from the waist down, except for socks, and was posed in a "sexual position" on her back with her knees bent, legs spread open, and arms out to the side. Her body had been placed by the open doorway of the building with her genitals facing the roadway. Hearn testified that Coco's body was in varying stages of decomposition and that there was an artificial flattening of her nose and mouth, which appeared to have occurred post-mortem. Coco was identified by her class ring, which was engraved with her name. The layer of dust on the floor was undisturbed which suggested that a sexual assault had not occurred in the building, but Hearn took photographs of nearby shoe impressions and tire impressions. The State introduced several photographs depicting Coco's body and the crime scene in conjunction with Hearn's testimony.

7

According to Hearn, one photograph of Coco's body showed a slight heel drag in the dust, which indicated she was placed in that spot and not dragged.

Hearn spoke with the Alexandria Police Department ("APD") after identifying Coco, and Hearn learned her car and phone were missing. Coco drove a Pontiac Bonneville sedan with Louisiana license plate number JUW468. Detective Cedric Green with the APD searched Coco's house and told Hearn that her bedroom was in disarray and her comforter was purportedly missing. Hearn also learned Coco had inherited a large sum of money, and there was an empty cash box at Coco's house that he recalled had appeared to have been pried open.

Hearn attended an autopsy of Coco conducted by Dr. Tommy Brown. Based on information from the APD, he learned Coco had last been seen alive about fifty-two hours prior to the discovery of her body. Dr. Brown concluded that Coco's body was located somewhere else where the temperature was higher due to her body's advanced stage of decomposition. It would have taken four to seven days for her body to reach the advanced stage of decomposition in the building where she was discovered.

Based on the fact that Coco's car was missing, Hearn conducted research to determine how high the temperature would be in the trunk of a car. It was about eighty-eight degrees in Alexandria, which meant the temperature inside a car would be over one hundred degrees. Hearn tracked Coco's phone to Houston. A juvenile found with Coco's phone told police he had bought the phone from an African American individual he knew as "Red." Hearn tracked Coco's car to the same general area in Houston, where it was being rented to people in exchange for drugs. The people found in possession of the car indicated they got the car from "Red." None of the people found with Coco's possessions were implicated in her

death, and the police never identified "Red." Hearn testified Coco's DNA was found in the trunk of her car, and Fred Landry's[1] DNA was found on the trunk latch of her car. The APD advised Hearn of a suspect they had in custody, Levay Duncan, but Hearn did not find anything in his investigation to believe Duncan was involved.

On cross-examination, Hearn indicated he was not privy to the progress of the APD investigation after October 2005. During his investigation, he learned "Red" was with his unnamed cousin when he dumped Coco's car and phone in Houston. Hearn agreed that if Coco's car was used to transport her body, and the car was left in Houston, then the killer would need "another vehicle to get back to wherever he's going[.]" Defense counsel asked if Landry could be considered a suspect since his DNA was found on the trunk latch. Hearn testified that it would have to be determined when and how Landry's DNA got on the latch, but he would be considered a person of interest. Hearn testified Dr. Brown did not find any trauma to Coco's body during the autopsy and concluded the cause of death was homicide by undetermined means. Hearn said a sexual assault kit was performed, but no sperm was detected, and the only DNA found under Coco's fingernails was her own. Defense counsel asked Hearn if his testimony proved Defendant killed Coco, and Hearn answered in the negative.

Dr. Tommy Brown, a Doctor of Osteopathic Medicine, was accepted as an expert in forensic pathology. Dr. Brown became board-certified in anatomic and clinical pathology in 1976, nuclear medicine in 1979, and forensic pathology in 1990. Dr. Brown said he had conducted more than 15,000 autopsies throughout

---

[1] Fred Landry was a sexual partner of Courtney Coco prior to her death in 2004.

his medical career and had been accepted as an expert in forensic pathology over a hundred times.

Dr. Brown performed an autopsy of Coco on October 5, 2004. He testified Coco's body was severely decomposed, and the stench was terrible. The State asked if someone who handled a decomposing body would have the same stench on them, and Dr. Brown agreed they would. Dr. Brown said it was important to have background information before forming an opinion. Dr. Brown was informed Coco was last seen on October 2, 2004 at 4:30 a.m., which was not consistent with the advanced stage of decomposition. Dr. Brown testified Coco must have been exposed to high heat during the period, which accelerated the decomposition state. Dr. Brown agreed being in the trunk of a car could be a cause of accelerated decomposition.

Dr. Brown's external examination of Coco revealed no signs of trauma. Coco's stomach contained French fries and chewing gum, and she had alcohol in her system. Dr. Brown concluded the cause of death was homicide by undetermined means due to the body's "severe state of decomposition which obscured the anatomic findings." He testified the most likely mechanism was asphyxia due to smothering based on the lack of trauma to the body, lack of diseases, and after reviewing the toxicology report. His autopsy report was admitted into evidence and detailed his findings as follows:

> **CAUSE OF DEATH:  Homicide by undetermined means in a severely decomposed body.**
>
> **MANNER OF DEATH: Homicide.**
>
> **COMMENT:  All procedures were performed by the prosecutor including, collection of decomposition fluid and spleen for toxicology, rape kit, fingernail scrapings, clippings and swabs,**

**pulled head hair, pulled and combed pubic hair, removal of clothing and recovery of hair from clothing and body.**

**The body was in a severe state of decomposition, which obscured the anatomic findings. The circumstances of the case are indicative of a homicide. The mechanisms would most likely be due to asphyxia due to smothering. Toxicology results revealed an ethanol content contributed most likely from the severity of the decomposition state.**

Dr. Brown was then questioned regarding the toxicology results as follows:

Q. So the last sentence there, toxicology results revealed an ethanol content contributed most likely from the severity of the decompositional state. What on earth does that mean?

A. The, um, autopsy findings on NMS,[2] our toxicology with NMS shows that, uh, a toxicology analysis was done, uh, 2016 [sic] and sent to NMS. Um, and their results showed that the ethanol or the alcohol level was 0.178, um, grams per hundred, uh, milliliters and that is about, uh, half of what, uh, the original, um, autopsy findings at Ameritox was. It also showed, uh, that she had ingested some Tramadol which is a synthetic opioid, uh, uh, that is used, uh, for pain and, and it is also an opium derivative. Uh, that 1100, uh, nanograms per milliliter. Nanograms is billionths of a milliliter.

Q. So, so explain that to me. How is it we have, uh, a NMS Lab's report which finds the blood alcohol concentration of .178 and the spleen has a .32. How does that happen?

A. The interval of time for one reason, but also the spleen, um, its -- there's no studies that I know of that you take blood in the spleen and you can quantitate the amount of blood from the spleen, uh, and put it into your, uh, milieu or the findings that you're going to make your decision on for the autopsy.

. . . .

A. In my opinion, she was probably drinking at the time, but that would not account for her being, uh, totally -- or could have died from her alcohol intoxication.

Q. All right.

A. There's a number of things that might interfere with the results. Number one is it's postmortem. Number two is there's a, a peripheral distribution of the, uh, alcohol and the drugs within the

_____

[2]NMS refers to the lab that performed the 2015 toxicology report.

11

system. After death, it goes to different parts of the organs . . . and the spleen is a peripheral organ, so it is going to show an elevated level also. However, there's no studies in forensic and, uh, toxicology does not use the spleen as a quantitative reason . . . to determine that the person had died from alcohol intoxication. It's not acceptable, uh, as a quantitative means. Qualitative you can say there's alcohol there, and I can try to divide it up saying that . . . she probably did imbibe with alcohol, but I -- it was not near where they are referring to as .32.

Generally, up to 0.16 of blood alcohol concentration may be attributed to body decomposition; however, Dr. Brown restated that the spleen is not an acceptable means of determining blood alcohol concentration. In his opinion, Dr. Brown did not think Coco died from alcohol poisoning or a drug overdose. The chewing gum was a significant factor in determining Coco was asphyxiated, because it suggested to Dr. Brown that she was likely chewing the gum when she was smothered to death, which caused her to accidentally swallow the gum. Drs. Harry Bonnell and Adel Shaker reached the same conclusions as Dr. Brown.[3]

On cross-examination, Dr. Brown testified that there were no lacerations around Coco's neck or fractures on the coracoid or hyoid bones to suggest strangulation. His conclusion that Coco was asphyxiated was a diagnosis of exclusion based on his education and experience. Dr. Brown testified that he wanted to see which drugs were in her system, so he extracted blood from her spleen for the purpose of qualitative analysis only. The 2015 toxicology report indicated Coco had tramadol in her system, but Dr. Brown did not think the amount of tramadol was enough to indicate an overdose:

> A.     Not in my opinion. No. The, um, um, one study shows, um, five deaths, uh, due to Tramadol. The mean was . . . six thousand one hundred. She only had one thousand

---

[3]Neither Dr. Bonnell nor Dr. Shaker testified at trial. In brief to this court, the State asserts defense counsel failed to notify the State of his intention to call Dr. Norman to testify as an expert in forensic pathology pursuant to La.Code Crim.P. art. 725. The State learned of Dr. Norman testifying during jury selection, and the State claims it was then too late to obtain the presence of either Dr. Bonnell or Dr. Shaker to rebut Dr. Norman's trial testimony.

one hundred so the deaths that were reported due to Tramadol were five thousand nanograms per milliliter higher than what she had in her bloodstream.

The therapeutic level for tramadol was listed up to eight hundred nanograms, so Coco was "a little bit over the therapeutic level" according to Dr. Brown.[4]

The State called Fred Landry to testify. Landry testified that he had a sexual relationship with Coco while she was dating her boyfriend, "Jitty." He said he did not have anything to do with her death. On cross-examination, Landry stated he did know that his DNA had been found on the trunk latch of Coco's car.

Detective Cedric Green, an APD detective on the case since its inception, also testified. Det. Green testified he searched Coco's house and spoke with Jackie Hampton, Lonnie Melbert, and Lewis Jones, the last people known to have seen Coco alive.[5] They were never eliminated as suspects, but Det. Green testified there was no evidence to suggest their involvement in Coco's death. Evidence at the house revealed Coco, Hampton, Melbert, and Jones had been playing dominos and smoking weed. Det. Green learned that on the night of October 1, 2004 prior to her disappearance, Coco went to a convenience store called The Gate. Photographs taken of the surveillance footage show the clothes Coco was wearing, and the police found those clothes at her house. Further investigation revealed Coco had visited the Rapides Parish Health Unit and been diagnosed with a sexually transmitted disease shortly before her disappearance. In a letter to Coco dated September 23, 2004 a nurse from the health unit indicated it was important

---

[4]Dr. Brown did not indicate whether, like the amount of alcohol found in Coco's system, the amount of tramadol would have decreased at the time of the 2015 toxicology testing.

[5]At the time of trial, the whereabouts of Hampton, Melbert, and Jones was unknown.

for Coco's sexual partner to also receive treatment. Someone handwrote the name "Jitty" on the letter, indicating he was Coco's sexual partner.

On cross-examination, defense counsel questioned Det. Green about other persons of interest in the case. Det. Green testified that Levay Duncan went by Coco's house with Melbert, and that on October 2, 2004 Coco brought Hampton and Jones home after the domino game. Det. Green testified that Coco had been dating multiple people before her disappearance, one being Hampton's brother, Floyd Williams, also known as "Jitty." Coco's sister, Evans, was another person of interest in the investigation. Det. Green stated that Evans was evasive and did not want to talk to the police. Coco was also dating Earnest Veal or "Prince," who became a person of interest. Det. Green testified that Coco's house had been burglarized at least two times leading up to her death, and the police never found the culprit or culprits. When she turned eighteen, Coco began receiving inheritance money. In June 2004, Coco received a $20,000 lump sum payment, and by July, the money was gone from her bank account.

Officer William Bates, a crime scene officer with the APD for nineteen years before his retirement, also testified. Officer Bates testified he conducted a search of Coco's house and took photographs in October of 2004, after Coco's body was discovered in Texas. According to Officer Bates, all the entrances of the house were locked, and he had to break a window to gain access. Otherwise, there was no sign of forced entry into her house, so Officer Bates testified either the perpetrator walked through an unlocked door or was let into the house. He noted a garbage can had been turned over in the kitchen and Coco's mattress had been lifted. The lockbox under the bed was empty except for a box of cigarettes. Officer Bates testified the last time Coco's phone was used in Alexandria was 4:30 a.m. on

14

October 2, 2004. Coco's last phone call was to a house belonging to Latonya Anderson, Williams' girlfriend.

Janet Vayon lived in Winnie, Texas, and worked at the CCSO as a civilian employee in 2004. Vayon testified that she was friends with identification witness, Jude Wilson, and had graduated with Wilson in 1981. According to Vayon, Wilson had a photographic memory and was an artist. Vayon stated the Texas Rice Festival was held on the first weekend in October every year. Vayon was contacted by investigators in September 2022 and asked if she had any recollection of an incident which occurred on FM 1406 in 2004. Initially, she did not remember anything. However, she later remembered October 3, 2004 was a Sunday and the day of the goat and lamb show at the Rice Festival.[6] Vayon was a chairman of the show and recalled it started at 5:00 p.m. and lasted until about 9:00 p.m. On her way home, Vayon passed by the abandoned building where Coco's body was later found. Vayon was following Wilson in her truck when a vehicle "shot out" in between them. Vayon testified that Wilson went to the CCSO "probably four days later" to report the incident.

> Q. All right. Ms. Vayon, at the time that he came to the Sheriff's Office had Courtney Coco's body been discovered in that building?
>
> A. No, sir. This was the day before I think the body was found, so we knew nothing about a body. We were just -- but when he came in four days later, the body had been found, and he felt like that information would be very important.
>
> Q. That, that's what I mean. Let me, let me be clear about the question I'm asking.
>
> A. Okay.

---

[6]The precise date of the incident was a major point of contention at trial and remains contested on appeal.

Q. At the time that you see this almost wreck with the person you later find out was Mr. Wilson, when you see that wreck, you had no clue there was a body in that building?

A. Not at all. No, sir.

Q. Mr. Wilson comes into the Sheriff's Office after the body is found?

A. Correct.

The only thing Vayon could remember about the other car was that it was dark colored. Vayon testified that she had some knowledge that a body was found at the abandoned building from working at the CCSO, but she had not thought about what day the body was discovered.

Q. So is there any doubt in your mind that what you observed, this near wreck between Mr. Wilson and this car, was on that weekend?

A. No doubt.

Q. [W]as it, uh, a Friday night, Saturday night, or Sunday night?

A. It was Sunday, [be]cause I went to work the next morning, Monday.

Vayon said she tried to write down the car's license plate number, but she lost the piece of paper and could not remember the license plate number at trial.

On cross-examination, Vayon stated the Rice Festival usually starts on a Wednesday and ends on a Sunday. In 2004, though, the Rice Festival was longer than usual, with a barbecue cookoff taking place the weekend before. The cookoff was on Friday and Saturday but some teams left on Sunday. Defense counsel introduced into evidence the 2004 Rice Festival program which listed the dates of the festival as September 24 to October 3, 2004. Vayon did not recall whether Wilson was hired to design the brochures or programs in 2004.

16

Vayon was contacted by Trooper Younger in August 2022, at which time Vayon said she had no recollection of the near wreck between Wilson and the unidentified car. Vayon explained that Trooper Younger brought up the Coco case, which she did not think had anything to do with the incident at the time. Trooper Younger told Vayon what the police thought she was a witness to on October 3, 2004. She could not recall whether Trooper Younger mentioned Wilson's name, but she testified she did not speak with Wilson after her conversation with Trooper Younger. Vayon said "[r]ight after [she] got off the phone" with Trooper Younger, she remembered the incident. When she was contacted by Trooper Younger in September, a month before trial, Vayon provided a detailed statement.

Vayon testified that people who are interviewed at the CCSO usually write down their statements in their own handwriting, and then the police type the statements for the witnesses' signatures. She explained that some investigators listened and took notes during the interview and typed the witness's statement from their notes before asking the witness to sign. Vayon was certain the incident occurred on October 3, because she would not have been in a truck and trailer any other day of the Rice Festival.

Jude Wilson lived in Winnie for most of his life and traveled on FM 1406 all the time. The State questioned Wilson about his recollection of the night of the near wreck:

> Q.     So, uh, tell me, tell me kind of the circumstances. When was this? What time of day?

> A.     Um, it was at night and, um, I don't remember what the day was exactly or anything like that. I, I'm terrible with dates and stuff like that. Um, but I do remember that, um, my wife had asked me to pick up some cigarettes . . .

17

. . . .

A.     I went across the street to Texaco, which I know they close about ten o'clock, so, um, I got it there and then I took off, uh, and then headed back home.  And as I was coming over the overpass, um, I noticed there was a car there and (interrupted)

Q.     Car where?

A.     At this, um, house. Uh, there was an abandoned house.

Wilson testified that as he was driving over the overpass, he saw someone walk in front of the headlights of a car that was parked roughly ten or twelve feet away from the building.  The person got in the car and started backing out of the driveway. Wilson said he had to swerve to avoid hitting the car as he was driving between fifty-five and sixty miles per hour.  Wilson saw part of the car's license plate, and he testified it was a Louisiana license plate with the letters "J" and "W" and the number eight. Wilson specifically remembered the letters because they were his initials.  Wilson testified the person driving the car sped off and got on I-10 going towards Houston.

When asked to describe the person he saw, Wilson said he appeared young, had really short hair, and did not have facial hair.  Wilson testified the person "had the features of a white person" with "regular lips" and a regular nose.  Wilson did not see the person's face from the front; he only saw the person's profile.

Wilson drew the map on the Rice Festival brochure and passed the brochures out.

Q.     So, in relation to the Rice Festival, when is this almost wreck that we're talking about?

A.     Um, I couldn't tell you right off hand because I -- there were so many things going on.  Um, it, it was just everything was just like a blur.

18

Q.     When you say so many things going on, you mean, so many things going on at the Rice Festival?

A.     At the Rice Festival. I was up and down the road all the time.

Q.     So, generally, when is the Rice Festival?

A.     Um, it used to be the, the first week of October.

Wilson did not report the near wreck immediately but made a report on October 8, 2004 after he saw that a body had been found. Wilson said he told the police at the CCSO that he did not remember what day the incident occurred because he had been busy passing out the brochures so he could get paid for his work.  He provided information regarding the person's description and license plate number. After talking with the police, he was provided with a prepared statement to sign. Wilson's written statement at the CCSO provided:

My name is Jude Wilson. . . . I travel FM 1406 several times a day. There is an abandoned house on FM 1406 in which the body was found. I was traveling down FM 1406 I believe it was Monday, September 27, 2004.  I had gone to the Power Fuel and I was on my way back to the house.  I believe it was about 10:15 PM because Power Fuel closes at 10:00 PM and I had just made it in there before they closed. I was coming over the overpass at Interstate 10 and I noticed a car backing out of this abandoned house. I really paid attention to the car because it did not appear that they were going to stop and I thought they might back out in front of me. They stopped almost at the road.  I noticed the car was a dark color and it had Louisiana plates. I recall part of the license plates as being JW because [those are] my initials and it stood out to me.  It appeared to me to be an older model car because I noticed the tail lights to be boxier than that of a modern car. It was dark inside the vehicle so I could not see inside the vehicle.  I did look in the mirror after I had passed and the vehicle was traveling South on FM 1406 over the bridge and heading back toward the Winnie area.  The only other car that I have ever seen at this abandoned house was a white four door car which was approximately one month ago[;] this car also had Louisiana Plates on it.

When I saw the news last night, October 7, 2004, with the description of the vehicle, there was no doubt in my mind that this is the vehicle that I saw backing out of the driveway of this abandoned house.

Wilson was not contacted about the Coco case until Detective Dryden from the APD contacted him a few years prior to trial, approximately fifteen years after the near wreck. Wilson drew a silhouette of the person based on his memory for Detective Dryden. Detective Dryden called Wilson to ask if he would be willing to look at a photographic lineup, and Wilson testified he "was kind of skeptical at first" but agreed to do so. Wilson identified Defendant, a white man, as the person driving the car both in the photographic lineup and at trial.

On cross-examination, defense counsel asked Wilson why he had not mentioned seeing the number eight in the license plate number in any of his prior statements to police. Wilson said he told the CCSO but "that apparently did not get into the statement." The statement also did not mention that Wilson saw the person walking and getting into the car, which Wilson claimed he told the police. Wilson acknowledged that he signed an affidavit certifying his statement was true and accurate, but he said he did not read the statement before signing. Wilson testified that he had never read his 2004 statement. Regarding his statements to Detective Dryden in 2020, defense counsel asked Wilson why he was skeptical about doing a photographic lineup. The following colloquy occurred:

A.     Because it's almost twenty years later, and . . . I've never done a lineup before. Uh, as I said I did a, I did a drawing for him and sent it to him, and that's when he asked me to pick him out of a lineup, and I didn't know whether -- [be]cause if, if I hadn't of been able to recognize his features, I certainly would not have done that.

Q.     But did you not tell Detective Dryden I didn't see his full face? Did you not tell him that?

A.     I'm sorry. Repeat that.

Q. Did you not tell him you did not see his full face?

A. Correct.

Q. Wouldn't that be why you'd be skeptical to pick someone out of a lineup?

A. No, [be]cause if I, if I see a side profile of somebody, um, and they had a side profile, then that would be acceptable as well.

Q. But they didn't show you a side profile. They showed you a frontal picture of six individuals. Right?

A. That is correct.

. . . .

Q. So, if you didn't see his full face, how could you pick him out of a lineup?

A. Because I can use my mind and I turned him (interrupted)

Q. They didn't (interrupted)

A. -- sideways and (interrupted)

Q. Oh -- the silhouette with regular lips and a nose. Correct?

A. Yes.

Q. Regular lips and nose that could be just about on anybody. Correct?

A. Yes, sir.

Wilson told Det. Dryden he remembered the car's license plate contained his initials, "JGW," but he did not mention the number eight in his statement. Wilson stated that he had a photographic memory. Wilson testified that before giving his statement at the CCSO, he recognized part of the license plate number from the news, which listed the plate number and location where Coco's body had been found.

21

Defense counsel questioned Wilson about the date of the near wreck. Wilson told Det. Dryden it occurred the week of the Rice Festival. Defense counsel asked why Wilson would have been passing out brochures on the last day of the festival, October 3, 2004, and Wilson testified he thought they had run out of brochures. Wilson testified he usually delivered the brochures on the Monday or Tuesday before the festival began. The festival usually began on a Friday, went through the next week, and concluded on a Sunday. In 2004, the festival was held September 24 through October 3, 2004. Coco's body was discovered on October 4, 2004. The statement he signed at CCSO indicated the incident occurred on Monday, September 27, 2004.

> Q. [T]o be clear you told Detective Dryden that on a Monday or Tuesday before the festival began which was in September that this incident happened to you, the car almost backing [into] you.

> A. Well, that's -- I didn't give any dates. I thought that may, that might be the time, but I really am not sure as to what time that was.

> Q. We get that. But you said it was before the Festival. Right?

> A. Uh, yes.

> Q. And did you not just see this piece of evidence that said the Festival was between the dates of September 24th and October 3rd. Is that correct?

> A. Yes.

> Q. So if it was the Wednesday before the Festival began, you would have seen that when? In October or in September? Based on these dates, sir.

> A. Uh, it would have been in September.

On redirect, Wilson said he had a problem remembering dates. Wilson testified that he trusted the CCSO to draft his statement based on all the information he provided to them, but they failed to do so. Wilson opined Caucasians have narrow noses whereas African Americans, Native Americans, and Vietnamese people have wider noses that are flatter to the face. Wilson said that when he looked at an individual, he took a snapshot of the person in his mind and turned the person sideways to see his or her profile. He testified he could also do the opposite to see a person's face from the front by looking at his or her profile.

Clyde Griffin also testified at trial that he saw Coco at a club the Friday before her body was discovered. The following Saturday afternoon, he saw a man driving Coco's green Pontiac Bonneville in Alexandria. Griffin had seen the man before but did not know his name. Griffin ultimately identified Veal as the driver of Coco's car in a photographic lineup.

Michelle Paul was Coco's aunt. She testified the family was able to enter Coco's house after it was released by the police, which was about eighteen days after the body was discovered. Paul noticed Coco's comforter was missing from her bed, and she found a load of "maybe six, no more than ten . . . mechanic rags" in the dryer. Paul testified that she thought it was weird that Coco would wash only a few rags and that the rags smelled strongly of bleach. Paul could not think of a reason why Coco would have mechanic shop rags.

Dr. Charles Delzell was accepted as an expert in mathematics. He performed a mathematical experiment to test the probability of a test subject correctly guessing certain independent variables. Dr. Delzell testified that the probability of the test subject correctly guessing two out of three letters on a license plate and correctly guessing it was a Louisiana license plate was less than

23

one percent. The percentage of probability would be smaller if the test subject also correctly identified the perpetrator in a six-person lineup. On cross-examination, Dr. Delzell said his probability experiment would be invalidated if the test subject knew the license plate information, because his "experiment assumes the test subject does not know the license plate[.]"

Lace Evans was Coco's sister and had been Defendant's fiancée for six years. Evans testified that she last spoke with Coco on the Thursday before her disappearance of October 2, 2004. Evans testified that in the early morning hours on the following Saturday, she and Defendant got into an argument, and Defendant left the house. Defendant came back to the house thirty minutes to an hour later, then he left again. Evans did not see Defendant again until Monday, the day Coco's body was discovered. Evans and Defendant lived together and shared one vehicle. Evans testified that Defendant had given her a promise ring. When the funeral home gave Evans the jewelry from Coco's body, she found a gold ring that fit directly into her promise ring as if it was a wedding set.[7] Evans claimed this confirmed her suspicion that Coco and Defendant were seeing each other behind her back. Evans said Coco and Defendant would disappear at the same time. One time, Evans called Defendant's phone and he "butt answered it," and Evans heard Coco's voice in the background. When Evans confronted them about her suspicions, both Coco and Defendant denied having an affair. Evans said Coco had a leopard print comforter. She claimed that she saw the comforter, or one exactly like it, at Defendant's mother's house about four years after Coco's death. The

---

[7]The autopsy report indicates Coco was wearing a gold colored ring "that had a heart shape" on her finger. There was no physical evidence of Evans' matching ring admitted at trial.

State introduced three videos Evans recorded of Defendant driving near the time of Coco's death. Evans disagreed with Det. Green's testimony regarding her level of cooperation in the investigation.

On cross-examination, Evans was shown a timeline which indicated her last phone call with Coco was on a Friday. She agreed the call was on Friday, not a Thursday as she previously testified. Evans acknowledged that she was a person of interest during the 2004 investigation. Evans testified that she saw Coco every day because they worked together, but she never paid attention to Coco's ring. Evans said it was possible that the comforter she saw at Defendant's mother's house was not Coco's. Evans testified that after Coco's death, she found a bag containing a license, among other items, that Coco had hidden in Evans' house. The license belonged to Alexandra Wolfe, Coco's ex-roommate. According to Evans, Wolfe had threatened to gut Coco with a blade when Coco kicked her out of the house. Evans never met Wolfe.

Charlene Goleman was married to Chris Clark, one of Defendant's friends. Goleman testified at trial she had a few troubling conversations with Defendant. One such conversation occurred when Defendant brought up Veal, whom Goleman had witnessed murder her friend's husband. She said Defendant bragged that Veal "had killed someone in cold blood" and only had to serve a seventeen year sentence. Goleman was asked whether Defendant talked about Coco, and she responded:

> A. Um, he would just make comments about the trip to Texas, um, uh, her body being found in the, in the warehouse wrapped up, um, her Mustang. Just different, different things along the lines that -- I mean, I didn't know Courtney so, I mean, I just, I would listen.

25

Goleman testified that she, Clark, and Defendant went to Toledo Bend, and they discussed Coco after Defendant had been drinking. Goleman claimed that she did not know any details about the Coco case at the time. The State questioned Goleman about the conversation as follows:

> Q. And did he tell you anything about what part he played in the murder of Courtney Coco?
>
> A. He didn't say what part he played[;] he just said . . . it was him and Earnest Veal and Earnest Veal's cousin. I don't know, I don't know his name. I didn't --
>
> Q. And what did he say about him and Earnest Veal and Earnest Veal's cousin?
>
> A. He told me that they'd all had sex with Courtney at one time but nobody would ever get in trouble for it because they used condoms. Um (interrupted)
>
> Q. [Was] there an occasion where, uh, he admitted, to choke, choking Courtney to you?
>
> A. Right. He just (interrupted)
>
> Q. Okay. Well, when . . . and where was that?
>
> A. Um, it was either in Toledo Bend or it was in Alexandria. One of the two.
>
> Q. All right. And what do you remember about him saying he choked Courtney?
>
> A. He made the comment about he did his hands like that, uh, choking Courtney and that was, I mean, that was just about it.

Defendant told Goleman that Coco's body was wrapped in plastic and put in a warehouse in Winnie close to I-10. Goleman answered affirmatively when asked whether a silver Mustang "played some part" in the "business concerning Courtney Coco[.]" Goleman had multiple conversations with Defendant about Coco in 2009 or 2010. Goleman said she gave a statement to the APD around the same time.

She indicated that she did not know anything about Coco's death other than what she had seen "on the news or whatever[.]"

On cross-examination, Goleman said she later learned that Veal had dated Coco and was a person of interest in the case. According to Goleman, Veal received a forty year sentence for killing her friend's husband. Goleman testified that she possibly knew that Coco's body was found in Texas before her conversation with Defendant. She also clarified that Defendant said the choking was a separate act from the sex, and Defendant did not say anything about Coco being choked during the sex he, Veal, and Veal's cousin allegedly had with her. Goleman testified that Defendant mentioned a Mustang, but she did not know if it was used for anything.

Lieutenant Carla Whitstine from APD testified next. Lt. Whitstine testified that phone records indicated on September 8, 2004 Coco called Evans' landline phone during Evans' work hours. Lt. Whitstine did not know whether Defendant answered the phone. The last time Coco's phone was used in Alexandria was October 2, 2004 at 4:30 a.m., and Coco's phone became active in Houston on October 3, 2004 at 10:00 p.m.

Ina Laborde was Coco's grandmother. Laborde testified she had last visited Coco at Coco's house about three weeks before her body was found. Laborde said Coco had a shower curtain with fish and seashells that she discovered was missing when she entered the house in the weeks following Coco's death. On cross-examination, Laborde indicated that she mentioned the missing shower curtain to Paul but to no one else.[8]

---

[8]Paul did not mention the missing shower curtain in her testimony. As Coco's family member, Laborde was not subject to the rule of sequestration.

Shamus Setliff was married to Tiffany Cedars from 2001 through 2013. Setliff had been friends with Defendant since childhood and had known Coco "since she was in diapers." Setliff testified that a month prior to Coco's death, he went on a camping trip to the Louisiana Dunes with Coco, Evans, and Defendant. A video taken during the trip reflected a date of February 21, 2004, but Setliff testified he remembered the trip took place on Labor Day weekend because he suffered injuries from a four-wheeler accident.[9] Setliff's impression was that "[t]here was something going on" between Defendant and Coco. According to Setliff, Defendant called him on the phone the week after Coco's death and told him the police found her body. Defendant told Setliff that "he'd done it." The State questioned Setliff about a conversation he had with his ex-wife, Cedars, that was recorded.

Setliff said he was probably at a residence he did not share with Cedars the weekend of Coco's death. At that time, he was employed with the Lafayette Drug Company delivering merchandise to various stores. Setliff claimed he delivered as far as Port Arthur, but he denied delivering to Winnie. In his prior statement to the police, Setliff had said his delivery route went through Winnie and that he had passed by the abandoned building where Coco's body was found three times the weekend of her disappearance. Setliff testified that he learned what Coco's body looked like from listening to a true crime podcast about the Coco case. Setliff told Cedars that Coco's body was "blue from the waist up[.]" Setliff said that his best friend, William Ahart, owned a red Mustang with silver ground effects in 2004.

---

[9]Labor Day was Monday, September 6, 2004.

On cross-examination, Setliff said he talked to police on three different occasions and gave three different statements. In his last statement, which was two or three weeks before trial, Setliff recanted every allegation he had made against Defendant. Setliff was again questioned about his whereabouts the weekend of Coco's disappearance:

> Q. Isn't it true that when you came back from that mysterious weekend of being gone, didn't your ex-wife find panties in your van?
>
> A. No, sir.
>
> Q. Didn't she find . . . cellophane wrap in your van?
>
> A. Yes, she did [be]cause I got pallets of stuff wrapped in cellophane.
>
> Q. And didn't she say you came home smelling the worst stink she's ever smelled in her entire life?
>
> A. Oh, yeah. I didn't know that.
>
> Q. Smell of death, sir? Did you have the smell of death on you?
>
> A. A camping trip maybe, but not death.
>
> Q. Um.
>
> A. I probably smelled pretty rough after a weekend.

Setliff said he went to Texas on Monday morning; despite his earlier testimony, he claimed, "I've never been to Winnie, Texas."

Tiffany Cedars testified that she did not know where Setliff was the weekend of Coco's disappearance. Cedars said that Setliff claimed he was not coming home because of injuries he sustained in a four-wheeler wreck. When he got home around two or three o'clock on Monday morning, Setliff was dirty and smelled bad. Cedars told him to wash his clothes in bleach and to take a shower.

Cedars went to Setliff's work van to get his shaving kit and found a pair of panties that did not belong to her and also Saran wrap in the van. When she confronted him, Setliff said the panties belonged to one of her friends. Cedars testified that Setliff's work delivery route went through Beaumont and Winnie. Cedars knew he went to Winnie, because Setliff had to go to the emergency room one time, and he went to a hospital in Winnie. The State asked Cedars about her recorded conversation with Setliff, and Cedars said Setliff's friend, Ahart, drove a silver Mustang in 2004. On cross-examination, Cedars denied having any personal knowledge of Coco's death and stated any information she knew about Coco's death was provided by Setliff. She said she was aware of Setliff's recent recantation. Cedars said Setliff lied to her and cheated on her during their marriage, but she did not tell the police about their conversation in order to get back at him for having affairs.

Tanner Dryden was a detective with the APD during the reinvestigation of the case in 2019. He identified Veal as the person Griffin said was driving Coco's car on Saturday. Det. Dryden named Defendant as the person Wilson identified as driving "Courtney's car" on Sunday. On cross-examination, Det. Dryden said he developed Wilson as a possible witness after reviewing the files from the prior investigations. Det. Dryden testified that after speaking with Wilson about his statement to the CCSO in 2004, Wilson determined the listed date of the near wreck, September 27, 2004 was incorrect. Det. Dryden agreed Wilson's "original statement was not in line with the timeline of Coco's death[,]" because Coco was alive on September 27, 2004. Defense counsel asked whether Det. Dryden

suggested the October 4 date to Wilson. Det. Dryden testified as follows:

> A.  Well, so what helped me establish the dates, as far as mentioned October 4th, um, the way he explained in the interview was that, uh, the night when he was almost in a wreck with, uh, Courtney's car or the car we now believe was Courtney's car that he . . . identified Anthony in. Um, the following, uh -- the days following that, he saw it on the news. That's how he was able to determine that that was the car he saw[;] that's why I asked about those dates.

Det. Dryden said he was unable to find the dates for the 2004 Rice Festival. Defense counsel showed Det. Dryden the 2004 Rice Festival Program, which had previously been entered into evidence, and asked:

> Q.  So if the official start date of the Rice Festival was September 29th and Mr. Wilson said he was doing what he was doing the Monday before it officially began (interrupted)
>
> A.  Um, hmm.
>
> Q.  -- what date would that have been?
>
> A.  The 27th.
>
> Q.  And what day was in his original statement?
>
> A.  The 27th.

On redirect, Detective Dryden testified that Wilson consistently stated the incident occurred the day before Coco's body was found.

The State re-called Evans to ask a single question:  whether she had anything to do with the murder of her sister.  Evans denied having any involvement.

Dr. Timothy Scanlan was offered and accepted as an expert in crime scene analysis and crime scene reconstruction.  Dr. Scanlan testified there were three reasons a body might be staged in a sexualized manner at a crime scene.  The first reason for sexual staging is to demean the victim, to cause a shock factor, or to get revenge.  The second possible reason for sexual staging is because the crime was committed by sexual serial killer.  Dr. Scanlan said there was no evidence to

suggest the second reason in this case. The third and final possible reason for sexual staging is to trick the police into believing there was a sexual motivation to the killing when one did not exist. Dr. Scanlan testified Coco's body was not hidden; rather, it was displayed or presented in a place where it could be easily found. Dr. Scanlan testified that someone had to completely outstretch her arms and manipulate her legs to put her in the position she was found in. He also found it important that the bottom half of her clothing was missing. The State asked Dr. Scanlan to read aloud the letter Coco had been sent from the Health Department regarding her STD diagnosis.

Dr. Scanlan determined the primary crime scene, "the location of the original criminal activity," was Coco's house, based on an examination of the photographs and her family's statements to police. Dr. Scanlan testified that "DNA and fingerprints play a larger role on stranger crimes, when you don't expect to see that person's DNA or fingerprints there." However, if it is reasonably expected to find a person's DNA or fingerprints somewhere, the significance of finding it is diminished because it cannot be determined when the DNA or fingerprint was left. Dr. Scanlan knew of the relationship between Coco and Landry, and he stated it could be reasonably expected to find Landry's DNA on Coco's car trunk latch. Similarly, Dr. Scanlan said he "wouldn't put any additional weight" into Defendant's DNA being found in Coco's car because of their relationship. The lack of Defendant's DNA and fingerprints, on the other hand, was not determinative to Dr. Scanlan as to whether Defendant had been in Coco's car. He testified that fingerprints are often unusable due to smudging, and DNA must be in a detectable limit.

32

The State then asked Dr. Scanlan whether the lack of anyone else's DNA under Coco's fingernails was significant:

> Q. All right. So, explain how the lack of foreign DNA doesn't mean that she wasn't murdered or that she didn't touch whoever was killing her at the time.

> A. Again, it's the absence of evidence, uh, theory. So, um, just because she doesn't have the DNA under her fingernails doesn't mean she wasn't in an altercation. It just means she didn't get DNA under her fingernails. Um, it's all the other factors around a case that you rely upon in that case. Um, I can tell you I've, I've had both. I've had some with DNA under the fingernails and sometimes violent scenes, um, sexual assaults, uh, close encounters where they have not had DNA under the fingernails. So, it's just that the DNA is present or not.

> Q. So, the bottom line is, is there any significance that this jury should draw from lack of foreign DNA under her fingernails?

> A. No, sir.

Although the police originally thought the tire tracks by the abandoned building where Coco's body was found were consistent with the tires on Coco's car, Dr. Scanlan requested expert analysis from the Louisiana State Police, who determined the tire tracks did not match Coco's car. Dr. Scanlan was aware of Wilson's identification of Coco's car at the scene but testified there was no physical evidence placing Coco's car at the scene. Dr. Scanlan testified there could have been more than one person who dumped Coco's body.

Stephanie Belgard was Coco's mother. Belgard said Williams was Coco's "steady boyfriend" at the time of her death, but she denied that Coco only dated African American men. The State introduced a photograph taken at Coco's prom of Coco and her date, Dustin Olson, who was Caucasian. Belgard testified she thought Coco was going to marry Olson one day. Regarding the money Coco inherited, Belgard explained that Coco's father had been receiving money for a

work accident when he died, and the money passed to Coco, his only child. Coco received fifteen hundred dollars a month and a lump sum of money every five years. Her inheritance was common knowledge in Coco's family. Belgard said Coco usually wore a t-shirt and underwear and sometimes a bra to bed.

On cross-examination, Belgard testified that she thought Coco "was being used by many people." Coco moved out of Belgard's house when she graduated high school. Defense counsel asked if Coco's preference for dating African American men became a point of contention after she moved out. Belgard said they did not talk about it but agreed that most of the people Coco dated were African American. Following Belgard's testimony, the State rested.

Dr. Stephen Norman was accepted as an expert in anatomic pathology, clinical pathology, and forensic pathology. Dr. Norman became board-certified in anatomic and clinical pathology in 1982. From 1984 to 2004, Dr. Norman was a deputy coroner at the Rapides Parish Coroner's Office before going into private practice to focus on autopsies and laboratory management.

Dr. Norman's involvement in the Coco case began in 2016 when he was contacted by a detective with the Rapides Parish Sheriff's Office ("RPSO") and asked to review several cold case files. Dr. Norman was provided with three sets of documents to aid his review: Dr. Brown's autopsy report, which included the 2004 toxicology report; the 2015 toxicology report; and a crime lab report from the Texas Department of Public Safety Crime Laboratory. Dr. Norman prepared a report for the RPSO wherein he concluded Coco's cause of death was an overdose of a combination of ethanol and tramadol.

His report described why he made such a conclusion:

> The toxicology analysis attached to the autopsy report (TOX 2004) was peculiar in that there is no indication that blood was tested. The only sample seems to be spleen, which is an organ that is not commonly tested in my experience. However, for ethanol in particular it appears to be a reasonable indicator and the finding of 0.32% (w/v) of ethanol would suggest that a similar level would have been present in the blood of Courtney Coco. The fact that stored blood was tested eleven years later (TOX 2015) and showed a level of 0.178% (w/v) further substantiates the original level, because stored blood is known to show decreases in the amount of ethanol over time. . . . When extrapolated to the eleven years of storage in this case, the two levels obtained in TOX 2004 and TOX 2015 are quite comparable, leading strength to the original level.

> Another factor to consider relative to estimating the degree of ethanol intoxication is the fact that after death[,] there can be endogenous production of small amounts of ethanol by the breakdown of glucose and by production of bacteria. This amount has been found to be as high as 0.15% (w/v) but this maximum level does not occur until the tenth day postmortem, only beginning to be detectable by the second or third day.

> . . . I believe that the ethanol level found in the spleen in TOX 2004 is most likely a very close approximation of the level that would have been in Ms. Coco's blood at the time of death. This level is very high and can by itself be lethal in some subjects.

> In the TOX 2015 report we also find tramadol (Ultram) in a concentration of 1100 ng/mL. Literature is not available regarding whether or not the level would decrease over time, but there is logically no reason to expect that it would increase. Therefore[,] I find this level most likely accurately reflects the level present in Ms. Coco's blood at the time of death. This is a very high level and would be considered by many to be "toxic" but not high enough to be lethal all by itself. However, the effects of ethanol and tramadol on sedation are not only additive but potentiating. Therefore[,] it is my conclusion that the death of Courtney Megan Coco was due to overdosage with ethanol and tramadol. (footnotes omitted).

Dr. Norman referenced several articles pertaining to the stability of blood alcohol in forensic blood samples and the interpretation of analytical changes in toxicology results post-mortem. Based on Coco's high level of blood alcohol concentration, Dr. Norman said that "at least part of it was . . . from consumption

of alcohol before death." He said Coco's blood alcohol concentration could not be solely attributed to fermentation of the blood caused by decomposition. Dr. Norman opined that the spleen was a good organ to accurately measure the concentration of blood alcohol since it contains a lot of blood.

When asked why the lab did not originally test for tramadol or ecstasy, Dr. Norman explained that the lab used in 2004 was "probably limited in what it . . . had the ability to test for[.]" In 2015, when a new toxicology test was performed, it was revealed that Coco had 1100 ng/mL of tramadol and an unknown amount of ecstasy in her system.[10] Dr. Norman testified that level of tramadol had been fatal in some cases and, combined with "a good solid dose of alcohol," could explain Coco's death.

Dr. Norman was aware that Dr. Bonnell reviewed the case in 2007 and that Dr. Bonnell wrote a one-page letter agreeing with the original findings made by Dr. Brown. Dr. Norman testified that he did "not have any respect for" Dr. Bonnell's opinion, because Dr. Bonnell was a "hired gun" who made his living off testifying. Dr. Norman said he thought Dr. Bonnell could be hired to say anything. Dr. Norman was not hired by the defense.

He further testified that there are five accepted manners of death: homicide, suicide, accidental, natural, and undetermined. Dr. Norman said the most likely manner of Coco's death was accidental. Dr. Norman said the autopsy by Dr. Brown was likely conducted thoroughly and completely; however, he felt Dr. Brown's ultimate findings were "absolutely ridiculous." Dr. Norman testified the cause of death and manner of death should have been listed as undetermined based on the information Dr. Brown had in 2004. Dr. Brown should not have based his

---

[10]The lab could not quantitate the level of ecstasy due to an insufficient amount of blood.

conclusion of homicide solely on the fact that Coco's body was dumped, and Dr. Norman also disagreed that the gum in Coco's stomach supported a finding of homicide by asphyxiation. Dr. Norman testified that gum is found in decedents' stomachs "all the time." There was nothing to support Dr. Brown's speculation that Coco had been chewing the gum when she was asphyxiated, which caused her to swallow it. Consequently, Dr. Norman "completely disagree[d]" with Dr. Brown's conclusions.

On cross-examination, Dr. Norman said that of the autopsies he has performed throughout his career, fifty of them were performed on people who died a violent death. He testified he was not board-certified in forensic pathology and the last formal training he had in forensic pathology was in 1978. Dr. Norman opined that it was reasonable to assume a non-alcoholic with a 0.25 blood alcohol concentration would be unconscious, but he did not believe an alcoholic with a 0.25 blood alcohol concentration would function normally. Dr. Norman did not talk to any of Coco's family members or friends to determine her drug and alcohol tolerance levels. Dr. Norman testified that he did not read any of the police reports, look at the crime scene photographs, or talk to any of the responding officers. Dr. Norman agreed obtaining background information is helpful, but he said, "[I]t's not to be used exclusively as the cause of death or the manner of death."

On redirect, Dr. Norman said it was common practice in forensic autopsies to collect vitreous humor, or fluid from the eyeballs, to determine how much of the alcohol concentration could be attributed to body decomposition. Dr. Norman indicated he was surprised that vitreous humor was not collected in this case as it could have answered a lot of the unresolved questions. Following Dr. Norman's testimony, the defense rested.

## ASSIGMENT OF ERROR NUMBER ONE

Although Defendant asserts one assignment of error, it is divided into two primary arguments. Defendant first argues the State failed to prove a homicide occurred. Alternatively, if a homicide was committed, he argues there was insufficient evidence to prove he committed it.

*Arguments on Coco's Cause and Manner of Death*

Defendant's predominant argument to this court is that the State failed to prove Coco died as a result of a homicide as opposed to an accidental overdose. Defendant summarizes his argument as follows:

> Courtney suffered no obvious trauma and was extremely intoxicated when she died. It is understandable to *initially* think that because of the "circumstances" of how she was found, she was killed by someone else. But the placement of her body in another state and in a sexually suggestive position does not prove a homicide occurred. Since the autopsy was inconclusive on cause of death, these "circumstances" are essentially what led Dr. Brown to declare this a homicide instead of another manner of death.

Defendant argues that because Dr. Brown testified there was no definitive conclusion he could reach "from the findings on the body" to indicate a homicide occurred, the autopsy was inconclusive. The sexual assault kit was negative, and no foreign DNA was found under Coco's fingernails to indicate she struggled. Defendant observes "there was no testimony or evidence in the autopsy that noted other common indications of asphyxiation, such as visceral congestion via dilation of the venous blood vessels and blood stasis, petechiae, cyanosis and fluidity of the blood." Further, the 2015 toxicology report revealed Coco had tramadol, ecstasy, and alcohol in her system, which could have caused her death.

Noting Dr. Brown based his conclusion of homicide, in part, on the circumstances surrounding the discovery of Coco's body, Defendant poses an

alternative scenario that aligns with both Dr. Norman's conclusion of an accidental overdose and the circumstances surrounding the discovery of Coco's body. In this scenario, Defendant theorizes someone who was with Coco could have, according to Defendant, "freak[ed] out" after she overdosed on drugs and alcohol, and he or she decided to put her body in the trunk of Coco's car. According to Defendant, this could reasonably explain why Coco's body was kept in the trunk for up to fifty-two hours before being dumped in Winnie. Defendant claims if someone went to Coco's house with the intent to kill her, that person would not have waited so long to dump her body because there would have been a plan in place. Further, he points out that Dr. Scanlan testified a body might be sexually posed to make police believe there was a sexual motive even when one did not exist.

Defendant argues that it is undisputed that Coco died before her body was dumped in Winnie and that someone had to bring her body there. Nevertheless, the State had the burden of proving that Coco died as a result of a homicide, which Defendant contends the State failed to do.

In response, the State notes that the jury was faced with two contradictory expert opinions. The State's expert, Dr. Brown, and the defense expert, Dr. Norman, disagreed as to whether Coco died of asphyxiation or from an accidental overdose. Although Dr. Norman disagreed with Dr. Brown's conclusion, the State contends the jury could have reasonably and rationally rejected the testimony of Dr. Norman and accepted the testimony of Dr. Brown. Additionally, the jury was informed that two forensic pathologists, Drs. Bonnell and Shaker, reviewed the file and agreed with Dr. Brown's conclusions. The State concludes the jury's decision was not irrational; thus, it may not be disturbed on appeal. Additionally, the State

argues the jury's conclusion of murder is the only conclusion that "explains the constellation of evidence aligned against" Defendant.

*Arguments on Defendant's Identification as Perpetrator*

Alternatively, Defendant argues that even if the State proved a homicide occurred, the State failed to prove Defendant committed the homicide or was a principal to her murder. "There was absolutely zero evidence or testimony that placed Anthony Burns with or near Courtney Coco before her death the weekend she died." Notably, there were no eyewitnesses who saw Defendant with Coco the weekend of her death, no phone records indicating they were together, and no forensic evidence in her home or in her car that put him with Coco. Defendant asserts the central question of who killed Coco was speculative and inconclusive.

Defendant contends the circumstantial evidence failed to exclude the reasonable hypothesis that one of the numerous other suspects, not Defendant, murdered Coco. As previously indicated, there was a plethora of persons of interest and suspects during the initial investigation and subsequent investigations. Specifically, Defendant notes that Veal, who had been identified as driving Coco's car in Alexandria on Saturday, October 2, 2004, is currently imprisoned for committing a homicide. In addition, Landry's DNA was found on Coco's car trunk latch.[11] Further, a call to either Williams or Williams' girlfriend was the last phone call Coco made before her disappearance; however, according to Defendant, "[t]here was no testimony regarding Floyd Williams', Jitty's, propensity to commit homicides."

---

[11]In brief, Defendant asserts that at the time of his trial, Landry was housed at the Louisiana Forensic Hospital after being declared incompetent to proceed to trial on a manslaughter charge. However, no corroborating evidence was admitted for the jury's consideration.

*Analysis*

In the instant case, there was no witness with first-hand knowledge of how Coco was killed. Accordingly, the State was required to prove Defendant was responsible through other evidence. In particular, the State presented evidence that Defendant was identified as leaving the abandoned building where Coco's body was found and further that he made incriminating statements to several individuals years after Coco's death. Defendant argues the identification of him leaving the abandoned building was dubious at best, and he argues the circumstances of each incriminating statement, in jail or drunk, and contradictory allegations "make each statement internally inconsistent with one another and highly improbable.

*Evidence of cause of Coco's death/homicide*

Having discussed the basic principles, we will now examine specific cases that guide this court's analysis of the present case. Although Defendant claims the State failed to establish that Coco was murdered, he does not cite or discuss any cases supporting his argument.

This court has previously considered cases in which the victim's cause of death and manner of death are sharply contested. In a fairly recent case, the defendant, Vail, was convicted of second degree murder over fifty years after his wife's body was found in the Calcasieu River. *State v. Vail*, 17-354 (La.App. 3 Cir. 12/28/17), 236 So.3d 644, *writ denied*, 18-202 (La. 11/20/18), 256 So.3d 998, *cert. denied*, ___ U.S. ___, 139 S.Ct. 1232 (2019). Vail told the police that he and his wife had been in a boat when she accidentally fell out of the boat and drowned. Despite the coroner ruling it an accidental drowning, Vail was arrested for her murder. However, a grand jury pretermitted the matter and Vail was released. On June 27, 2013, a grand jury indicted Vail for second degree murder, and he was

convicted as charged following a jury trial. On appeal, Vail argued there was insufficient evidence to support his conviction because the evidence was circumstantial, the State failed to exclude every reasonable hypothesis of innocence, and the State failed to disprove that the victim's death was accidental. This court disagreed:

> In summary, the jury heard extensive testimony from three expert witnesses regarding whether Mary Horton Vail was dead before she entered the water or died after she entered the water. The experts also offered opinion testimony as to the events surrounding her death, based on the reports and evidence available to them as well as their opinions pertaining to the cause of death. Two of the experts concluded the manner of Mary Horton Vail's death was a homicide. One testified that he concluded the death was an accidental drowning. The jury heard the testimony of all three experts in great detail, viewed the photographs, and read the autopsy report. Faced with conflicting expert opinions, the jury was entitled to accept whichever one, in their opinion, better explained the facts of the incident. La.Code Evid. art. 702. An appellate court should "not disturb the jury's choice to accept one expert's opinion unless that opinion is patently unsound." *State v. Ellis*, 28,282, p. 5 (La.App. 2 Cir. 6/26/96), 677 So.2d 617, 623, *writ denied*, 96-1991 (La. 2/21/97), 688 So.2d 521. After reviewing the experts' testimony in their entirety, we do not find the expert witnesses' opinions of the cause and manner of death to be patently unsound.

> In great part, most of the witnesses in this case presented evidence that was circumstantial in nature. This evidence consisted of contradictory statements made by the defendant, information from officers and investigators regarding the disappearance of two other women connected to the defendant, information regarding life insurance policies, testimony . . . that contradicted the defendant's statement that his wife accidentally fell into the river, and testimony regarding the relationship between the defendant and the victim at the time of her death.

> The testimony of three of the state's witnesses, however, is not circumstantial in nature. Wesley Turnage, Robert Fremont, and Bruce Biedebach all testified regarding statements the defendant made to each of them at different times wherein he stated to them that he killed his wife.

> Wesley Turnage testified that after Mary Horton Vail's death, while riding to work with the defendant one day, the defendant stated

42

"I didn't want the youngin' I got, and I didn't want another one, and fixed that damned bitch. She won't never have another kid."

Robert Fremont testified that, as a teenager, he met the defendant in California. He stated that on two separate occasions, the defendant told him that he killed his wife. On the second occasion, he testified that the defendant talked about hitting his wife in the head with an ore and some talk regarding a boat, a disagreement, and then the defendant feeling justified in taking her life.

Bruce Biedebach, who also met the defendant in California, also testified that the defendant, on more than one occasion stated he killed his wife. Mr. Biedebach was told it was ruled an accidental drowning, so he believed perhaps the defendant felt guilty because he failed to save her.

We find these admissions by the defendant, taken together, are confessions and therefore are direct evidence that he committed the offense. *See State v. Richardson*, 16-107 (La.App. 3 Cir. 12/28/16), 210 So.3d 340.

In the current case, the jury obviously concluded the three witnesses to whom the defendant stated he killed his wife were worthy of being believed. The jury seemingly believed Dr. Welke's conclusion that Mary Vail was dead when she went into the river late that evening or Dr. Baden's theory that she may have died in the water as a result of foul play. They heard testimony that she was fearful of being in "dark water" and never went out in the defendant's boat during the daytime, yet she allegedly went fishing with the defendant after dark. The jury also had the opportunity to peruse the Calcasieu Parish Sheriff's Office investigation report compiled in 1962 describing the direction of the investigation and the concerns being addressed to determine what happened to Mary Vail. While the report did not offer any conclusions or explanations, it did reflect the defendant's attitudes and behavior at the time of Mary Vail's death.

. . . .

Moreover, whatever was the cause of Mary Vail's death, strangulation, suffocation, or a blow to the head, the fact that the defendant attempted to cover up the offense by trying to convince the police that she accidently fell overboard was sufficient evidence for the jury to conclude he had specific intent to kill her. "[S]pecific intent is a state of mind, and need not be proven as a fact, but may be inferred from the facts and circumstances of the transaction and the actions of the defendant." *State v. Boyer*, 406 So.2d 143, 150 (La.1981). "Specific intent is an ultimate legal conclusion to be resolved by the fact finders." *State v. Graham*, 420 So.2d 1126, 1128 (La.1982).

The evidence, in this matter both direct and circumstantial, the testimonies, documents, and the defendant's statements, viewed in a light most favorable to the prosecution, contained enough information to exclude the defendant's assertion of innocence and supports the jury's finding that the defendant killed his wife, Mary Vail.

*Id.* at 668–69.

In *State v. Mayeux*, 18-97 (La.App. 3 Cir. 2/6/19), 265 So.3d 1096, *aff'd*, 19-369 (La. 1/29/20), 347 So.3d 623 (per curiam), *cert. granted*, ___ U.S. ___, 141 S.Ct. 225 (2020), *rev'd*, 19-369 (La. 3/9/21), 312 So.3d 250 (per curiam), this court affirmed Mayeux's second degree murder conviction.[12]  Mayeux, who was a chief of police and an assistant fire chief, reported a fire at his home where his wife's body was later found. *Id*. at 1100.  An autopsy could not determine the cause of his wife's death, but it was undisputed that she died before the fire. *Id*.  The cause of the fire was also undetermined; however, the fire marshal concluded the fire was started intentionally to cover up a homicide. *Id*.  After hearing the evidence and arguments at trial, the jury rejected Mayeux's hypothesis of innocence that the victim died from some type of natural cause and his hypothesis that the victim died suddenly while holding a lit candle, causing the house to catch on fire.  Though there was no direct evidence that a homicide occurred, this court found the circumstantial evidence was sufficient:

On review, we note that the record does not contain any direct evidence that Shelly was murdered, that Defendant killed her, or that Defendant started the fire at issue. However, various circumstantial evidence apparently led experts to conclude Shelly had died before the fire and the fire was intentionally set to cover up a homicide.  Both conclusions were based on expert opinions reached by scientific methods that excluded other ways Shelly could have died and other ways the fire could have been started.  The jury was made aware of

---

[12]Because *Mayeux* was pending on direct review when *Ramos v. Louisiana*, 590 U.S. ___, 140 S.Ct. 1390 (2020), was decided, his conviction, which was rendered by a non-unanimous jury verdict, was reversed.

these expert opinions and heard defense counsel challenge these opinions through its cross-examination and testimony elicited from Defendant's own witnesses and expert. The jury seemingly chose to believe the State's experts that Shelly was killed by some type of choking or strangulation that left no injuries and that the fire was intentionally set to cover up the homicide.

*Id.* at 1118.

In *Mayeaux,* this court compared that case to *Vail*, noting "the jury in the instant case did not have to rely solely on the experts' opinions, but was able to draw its own conclusions from the rest of the evidence introduced." *Id*. at 1120. The supreme court found the totality of the circumstantial evidence supported the jury's guilty verdict and affirmed Mayeux's conviction on initial review:

The State's case against defendant here is entirely circumstantial, and the most significant piece of the puzzle—the victim's cause of death—remains unknown, but the circumstantial evidence as a whole is quite incriminating. While it is more thoroughly summarized by the court of appeal, we highlight just some of the circumstantial evidence here. First, we note that defendant was an assistant fire chief who had firefighting equipment available to him—both in his carport and at the fire station, which was short distance away. Nonetheless, he made no effort to aid the victim or fight the fire and simply called 911 and waited. Second, defendant and the victim had a volatile relationship marked by domestic abuse and his threats to kill her, and he had also similarly abused and threatened previous romantic partners. Third, defendant made statements that were demonstrably false, such as claiming his wife had just miscarried, and he alleged personal movements that did not match the movements of his cell phone. *See* [*State v*.] *Captville*, 448 So.2d [676] at 680 n.4 [(La.1984)] ("[A] finding of purposeful misrepresentation reasonably raises the inference of a 'guilty mind,' just as in the case of . . . a material misrepresentation of facts by a defendant following an offense. 'Lying' has been recognized as indicative of an awareness of wrongdoing.") (internal citations omitted).

*Mayeux*, 347 So.3d at 625 (first, second, and third alterations added).

Although *Vail* and *Mayeux* are both distinguishable insomuch as the identities of the perpetrators of the murders were not at issue—and thus there was no hypothesis of innocence that an alternative perpetrator committed the

murders—the cases provide this court with a helpful discussion of the jury's verdict and its deference to conclusions drawn by the jury. Likewise, *Vail* and *Mayeux* support the proposition that this court considers the totality of the circumstantial evidence presented at trial, including the corroborating evidence tending to establish the cause of death, before determining whether the State proved Coco was killed.

However, courts have found insufficient evidence when the State fails to prove the victim was murdered with corroborating evidence and fails to exclude the reasonable hypothesis that the victim died from another mechanism. In *State v. Quinn*, 18-664 (La.App. 1 Cir. 3/27/19), 275 So.3d 360, *aff'd*, 19-647 (La. 9/9/20), 340 So.3d 829 (per curiam), *cert. denied*, ___ U.S. ___, 141 S.Ct. 1406 (2021), Quinn was convicted of second degree murder and obstruction of justice. It was not disputed that the victim died of asphyxiation, but it could not be determined whether the death was self-inflicted or caused by another person. The State did not introduce evidence showing that Quinn inflicted any injury upon the victim which caused the victim's death. Instead, the State established that Quinn had disposed of the victim's body and lied to the police when questioned. The jury was, however, presented with the reasonable hypothesis that the victim had committed suicide. There was evidence that Quinn was alone with the victim for less than five minutes and that the victim was, in fact, suicidal. The first circuit reversed Quinn's second degree murder conviction:

> After reviewing the entire record, we conclude that any rational trier of fact, after viewing all of the evidence as favorable to the prosecution as a rational fact finder can, necessarily must have had a reasonable doubt as to the defendant's guilt on the second degree murder charge. The State did not prove that Coulon was in fact the victim of a murder, and because the jury was presented with the reasonable hypothesis that Coulon committed suicide, the State failed

46

to meet its burden of excluding every reasonable hypothesis of innocence in this case. Thus, examining the evidence in the light most favorable to the prosecution, we find the alternative hypothesis that Coulon committed suicide to be sufficiently reasonable that a rational juror could not have found proof that the defendant was guilty of murdering Coulon beyond a reasonable doubt under the *Jackson* standard. Under the facts of this case, we can only conclude that the jury engaged in impermissible speculation in determining the defendant's guilt. See *State v. Mussall*, 523 So.2d at 1311.

*Id*. at 372–73.

The supreme court agreed with the first circuit's finding that the evidence was insufficient:

> After reviewing the record, the briefs, and the argument of the parties, we find the court of appeal correctly found the State presented insufficient evidence that defendant murdered the victim. . . .

> In addition, the *Jackson* standard of review does not allow a jury to speculate on the probabilities of guilt where rational jurors would necessarily entertain a reasonable doubt. *State v. Mussall*, 523 So.2d 1305, 1311 (La. 1988) (citing 2 C. Wright, Federal Practice & Procedure, Criminal 2d, § 467). The requirement that jurors reasonably reject the hypothesis of innocence advanced by the defendant in a case of circumstantial evidence presupposes that a rational rejection of that hypothesis is based on the evidence presented, not mere speculation. *See State v. Schwander*, 345 So.2d 1173, 1175 (La. 1977).

> The evidence establishing that defendant moved and tried to dispose of the victim's body is the most incriminating evidence against him. It is also the evidence proving the crime of obstruction. Despite the overwhelming evidence of obstruction, there was simply no evidence presented from which the jury could reasonably determine whether defendant killed the victim or found him already deceased. Despite defendant's deceit, shifting stories, and strange behavior, a jury could only speculate as to which of two scenarios occurred: (1) the tension between defendant and the victim erupted in a sudden murder, which defendant then tried to conceal; or (2) the victim committed suicide and defendant, fueled by methamphetamine and fear of law enforcement, decided to conceal the death rather than report it. *While evidence of concealment indicates consciousness of guilt*, State v. Davies, *350 So.2d 586, 588 (La. 1977),* here it is nearly the only evidence from which the jury could infer defendant killed the victim, and standing nearly alone it does not render the reasonable hypothesis of innocence unreasonable*. Accordingly, the court of

appeal did not err in setting aside defendant's conviction for second degree murder.

*Quinn*, 340 So.3d at 834–85 (emphasis added) (footnote omitted).

In *Quinn*, the supreme court found Quinn's act of concealing the victim's death was virtually the only evidence for the jury to infer guilt from, and that evidence by itself was not enough to render Quinn's reasonable hypothesis of innocence unreasonable.

Here, the present case is distinguishable in that the State presented an expert who unequivocally testified this was a homicide most likely caused by asphyxia due to smothering. Dr. Brown's autopsy did not reveal external or internal trauma indicating how Coco died. There were no gunshot wounds, no stab wounds, no evidence of death by natural causes, and no evidence of blunt force trauma such as fractures of the skull, ribs, or pelvis. Additionally, there were no lacerations around Coco's neck or fractures on the coracoid or hyoid bones to indicate choking or strangulation. Dr. Brown could not obtain a blood sample from one of the standard locations due to the advanced stage of decomposition, so he obtained blood from the spleen for the purpose of determining if Coco had any drugs in her system. Dr. Brown specified that his purpose for testing the blood from the spleen was for qualitative analysis, not quantitative analysis. According to Dr. Brown, it was difficult to determine how much of the blood alcohol concentration could be attributed to decomposition and how much could be attributed to any amount of alcohol Coco consumed prior to her death. After excluding all other reasons for her death, Dr. Brown concluded Coco was most likely asphyxiated but acknowledged there are generally no identifying characteristics for asphyxia. Thus, he ruled the cause of death was homicide by undetermined means. At trial, Dr. Brown

denounced the results of the 2015 toxicology report after he emphasized the spleen was not an acceptable means of determining blood alcohol concentration or drug quantification. However, Dr. Brown did not think the amount of alcohol and tramadol was enough to indicate an overdose even if he found the results of the 2015 toxicology report were reliable. Dr. Brown did not opine whether the level of tramadol would have decreased over the eleven-year period that the blood was stored.

Though the State established through trial testimony that Drs. Bonnell and Shaker agreed with Dr. Brown's conclusion of homicide, the State did not elicit whether the doctors reviewed the 2015 toxicology report before reaching their decisions. In fact, testimony indicated Dr. Bonnell reviewed the file in 2007, which was before the second toxicology analysis was performed.

The defense expert disagreed with Dr. Brown's conclusion of homicide by asphyxiation. In 2016, Dr. Norman reviewed the Coco file at the request of the RPSO. Dr. Norman disagreed with Dr. Brown's findings, instead opining Coco most likely died from an accidental overdose. This conclusion was founded on the 2015 toxicology report which showed the number of drugs and quantitative amounts of drugs and alcohol in Coco's system and after considering Coco's diminutive size.[13]

However, Dr. Norman acknowledged that he did not review any information other than what was contained in the 2004 toxicology report, the 2015 toxicology report, and a crime lab report from the Texas Department of Public Safety Crime Laboratory. Dr. Brown disagreed with Dr. Norman's conclusion that the death was

---

[13]The autopsy listed Coco as 63 inches tall and 105 pounds.

accidental, finding that a homicide had occurred, and further, Dr. Brown's opinion that Coco was asphyxiated by smothering was strengthened predominately by the testimony of Durison.

It is well-settled that the testimony of a single witness is sufficient to support a conviction "[i]n the absence of internal contradiction or irreconcilable conflicts with physical evidence." *State v. Dixon*, 04-1019, p. 12 (La.App. 5 Cir. 3/15/05), 900 So.2d 929, 936. An appellate court should "not disturb the jury's choice to accept one expert's opinion unless that opinion is patently unsound." *State v. Ellis*, 28,282, p. 5 (La.App. 2 Cir. 6/26/96), 677 So.2d 617, 623, *writ denied*, 96-1991 (La. 2/21/97), 688 So.2d 521. *See also Vail*, 236 So.3d 644.

Even though there were some inconsistencies between Durison's testimony at trial and his earlier statements, Durison explained the inconsistencies. His testimony that Defendant admitted to smothering Coco with a pillow is in line with Dr. Brown's expert opinion that she was smothered to death.

Goleman's testimony indicated that Defendant choked Coco at some unknown time, though she stated it was a different time from the alleged sex Defendant, Veal, and Veal's cousin had with Coco. Goleman had no knowledge of whether the act of choking was related to Coco's death or whether the alleged sex was related to Coco's death.

Setliff's testimony was wholly contradictory to his prior statements, and as the State argues in brief, it is believed that Setliff played a part in Coco's death. Setliff's testimony that Defendant admitted to him that "he'd done it" was without any details, and he denied telling Cedars any specifics about Coco's death.

In summary, and regarding the cause of Coco's death, the jury was made aware of the conflicting expert opinions, and defense counsel was permitted to cross-examine Dr. Brown's opinion. Faced with the conflicting expert opinions, the jury was entitled to accept whichever expert better explained the facts in their opinion. Based on *Ellis*, 677 So.2d 617, we find that Dr. Brown's opinion that Coco died as a result of a homicide is not unsound because circumstantial evidence and testimony presented corroborates his opinion that she was asphyxiated by smothering. Though some of the witnesses gave contradictory statements regarding Defendant's allegedly incriminating statements, Durison did testify that Defendant admitted to smothering Coco with a pillow.

*Defendant's Identification as Perpetrator*

Having found the record contains sufficient evidence to support the jury's finding of a homicide, we next address Defendant's identification as the perpetrator.

We will first address the State's reliance on Wilson's identification testimony to place Defendant at the dump site. In his brief, Defendant attempts to cast doubt upon Wilson's identification of him as the person seen leaving the abandoned building where Coco's body was dumped. He states, "Wilson's 'identification' must be kept in context: he claimed only to be able to see a man in a car, after 10:00 PM on some undetermined night, while driving at least 55 mph, and trying to avoid a wreck." Defendant concludes that Wilson's testimony did not negate the reasonable probability of misidentification, arguing that Wilson did not positively identify Defendant; but instead, Wilson claimed Defendant's features as seen in the photographic lineup exhibited features consistent with the profile of the person he saw fifteen years earlier. Wilson never saw the person's face, only their

profile, and he stated he was able to "turn" the person's head to make an identification.

Defendant also points out there was a question as to the date of the near wreck. The 2004, Rice Festival took place from September 24 to October 3, 2004 with the incident occurring during that period according to both Wilson and Vayon. Coco's body was found on October 4, 2004, and Wilson made a statement at the CCSO on October 8, 2004. Though Wilson claimed he did not provide the CCSO with a date, Defendant observes Wilson signed an affidavit under the penalty of perjury, and his statement indicated the incident occurred on September 27, 2004. When Wilson spoke with Det. Dryden in 2019, he could not remember the date of the incident, but he agreed it could have occurred on October 3. Vayon was adamant the date was October 3, because it was the day of the goat show at the Rice Festival and the only day she should have been driving a truck and trailer. In his brief, Defendant acknowledges Vayon's testimony, if believed, tended to establish the date of the incident as having occurred on October 3, 2004. However, assuming Vayon's testimony established the correct date, Defendant argues Wilson's testimony was not a positive identification of him or of Coco's car.

On the other hand, the State contends Wilson's identification is reliable, circumstantial evidence that corroborates the direct evidence of Defendant's guilt, that of the three incriminating statements. The State recognizes the discovery of Wilson as a possible identification witness was one of the most bizarre and interesting twists in the case but argues Wilson's testimony was bolstered by the testimony of Vayon and Dr. Delzell.

As stated in *State v. Hypolite*, 04-1658, p. 5 (La.App. 3 Cir. 6/1/05), 903 So.2d 1275, 1279, *writ denied*, 06-618 (La. 9/22/06), 937 So.2d 381, (citing *State v. Bourque*, 94-291 (La.App. 3 Cir. 11/2/94), 649 So.2d 670), "[t]his court will overturn a jury's credibility assessment only when a witness's own testimony demonstrates that the witness's ability to perceive events was impaired in some way." In *Bourque,* 649 So.2d at 670, this court overturned the jury's assessment of witness credibility after considering that one eyewitness admitted to consuming a large amount of alcohol before the offense and the other eyewitness was a child who believed all white men looked alike, and the defendant was white. After considering the eyewitness testimony in light of the contradictory testimony of the other witnesses, and viewed in the light most favorable to the prosecution, this court concluded no rational trier of fact could have found Bourque guilty beyond a reasonable doubt.

In line with the principles discussed in *Hypolite* and *Bourque*, we find Wilson's ability to perceive the identity of the person leaving the abandoned building was impaired, even assuming the incident occurred on October 3, 2004. Perhaps most importantly, there was a fifteen-year interval between when Wilson saw the driver of the car in 2004 and when he drew the silhouette for Det. Dryden and identified Defendant out of a photographic lineup in 2019. Additionally, the circumstances of when and how Wilson saw the person were far less than perfect. Wilson claimed the incident occurred between nine and ten o'clock at night while he was driving at least fifty-five miles per hour and trying to avoid a car wreck. It was dark outside, and there were no dome lights to illuminate the person's face. Wilson testified the driver appeared young, had short hair, and did not have facial hair, but he said those were the only features he could see. At trial, he said the

person had Caucasian features, which he represented as regular lips and a regular nose. Pertinently, Wilson did not see the person's face from the front; he only saw the person's profile. His silhouette drawing of the person's profile lacked considerable details. Nonetheless, he was able to pick Defendant out a six-person photographic lineup despite his skepticism. Also, there were numerous inconsistencies between his original statement at the CCSO and his trial testimony.

Wilson's identification of Coco's car was equally perplexing. It is undisputed that Coco drove a Pontiac Bonneville with Louisiana license plate number JUW468. In his statement at the CCSO, Wilson described the car he saw as a dark-colored older model car with Louisiana plates containing the letters "J" and "W." Wilson testified the license plate also contained the number eight at trial. At first, Wilson's identification of the partial plate number seems like concrete evidence that Coco's car was at the site where her body was found. However, Wilson testified that he saw the description of the car and the license plate number on the news prior to his statement at the CCSO, which casts doubt upon his identification. Dr. Delzell explicitly said his probability experiment would be invalidated if the test subject knew the license plate information, because his experiment assumed the test subject did not know the license plate. Further, the Louisiana State Police determined the only tire tracks found near the abandoned building did not match Coco's car, meaning there was no physical evidence of her car being at the scene. While acknowledging that the determination of witness credibility is left to the jury's discretion, based on the foregoing, we find Wilson's identification testimony was internally contradictory and unreliable.

As discussed above, when a conviction is based on circumstantial evidence, the State "must exclude every reasonable hypothesis of innocence" to convict. *State v. Camp*, 446 So.2d 1207, 1209 (La.1984). In *State v. Chism,* 436 So.2d 464, 469 (La.1983), the supreme court explained the hypothesis of innocence:

> Circumstantial evidence involves, in addition to the assertion of witnesses as to what they have observed, a process of reasoning, or inference by which a conclusion is drawn. Like all other evidence, it may be strong or weak; it may be so unconvincing as to be quite worthless, or it may be irresistible and overwhelming. There is still no man who would not accept dog tracks in the mud against the sworn testimony of a hundred eye-witnesses that no dog passed by. The gist of circumstantial evidence, and the key to it, is the inference, or process of reasoning by which the conclusion is reached. This must be based on the evidence given, together with a sufficient background of human experience to justify the conclusion. Prosser, [Law of Torts, p.] 212 [(4th ed. 1971)].
>
> Consequently, before a trier of fact can decide the ultimate question of whether a reasonable hypothesis of innocence exists in a criminal case based crucially on circumstantial evidence, a number of preliminary findings must be made. In addition to assessing the circumstantial evidence in light of the direct evidence, and vice versa, the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised; and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence.

Therefore, the ultimate question is whether the evidence is sufficient to support a determination that the reasonable findings and inferences permitted by the evidence exclude every reasonable hypothesis of innocence.

In the present case, Defendant's hypothesis of innocence, as discussed below, is that someone else killed Coco, which is the same argument presented to the jury at trial. Considering *Captville*, 448 So.2d 676, and Defendant's failure to

raise any new hypotheses, Defendant's argument fails because we find it was reasonable for the jury to reject his claim.

*Defendant's Incriminating Statements*

Defendant further argues that, even assuming the State's case negated any reasonable probability of misidentification based on Wilson's testimony, the State failed to prove Defendant was the person who killed Coco. There were three witnesses who testified that Defendant made incriminating statements regarding his role in Coco's death. Defendant argues the statements he allegedly made to Durison, Goleman, and Setliff, even if believed, were not "confessions." He relies on *State v. Richardson*, 16-107, pp. 26–27 (La.App. 3 Cir. 12/28/16), 210 So.3d 340, 358, where this court described the difference between admissions and confessions and the importance of their distinction as follows:

> "The term "admission" is applied to those matters of fact which do not involve criminal intent; the term "confession" is applied only to an admission of inculpatory facts and a confession of guilt." *State v. Marr*, 626 So.2d 40, 45 (La.App. 1 Cir. 1993) (quoting *State v. Jones*, 451 So.2d 35 (La.App. 2 Cir.), *writ denied*, 456 So.2d 171 (La.1984)), *writ denied*, 93–2806 (La. 1/7/14), 631 So.2d 455. In *State v. Boothe*, 532 So.2d 203, 206 (La.App. 3 Cir. 1988), a panel of this court explained that there are three categories of incriminating statements:
>
> > The first category is the confession which admits the guilt of the crime charged. The second is the admission which involves the existence of criminal intent. The third is the admission or acknowledgment of facts which tend to establish guilt, but which do not involve the existence of criminal intent. The Court concluded that remarks which were not express admissions of guilt or facts showing criminal intent can be introduced without the foundation necessary for admitting a confession, despite the fact that the statements might be considered inculpatory.
>
> In this context, the distinction between a confession and an admission is that a confession is considered direct evidence while an admission is considered circumstantial evidence. *State v. Hunter*, 39,664

(La.App. 2 Cir. 6/29/05), 907 So.2d 200, *writ denied*, 05–2027 (La. 3/10/06), 925 So.2d 507.

Thus, and as the State argues, if Defendant's statements to Durison, Goleman, and Setliff are confessions, then his statements are considered direct evidence of his guilt, whereas if his statements are admissions, then they are considered circumstantial evidence. *See also State v. Rabalais*, 20-303 (La.App. 3 Cir. 4/7/21) (unpublished opinion) (2021 WL 1295020); *State v. Boothe*, 532 So.2d 203 (La.App. 3 Cir. 1988).

According to Durison's testimony, Defendant admitted to killing Coco while they were sharing a jailcell in 2011.[14] Defendant told Durison that he had killed someone by smothering them with a pillow and said he dumped the body in Texas. Durison testified that Defendant said he wrapped the body in a blanket, though the specifics of whether the blanket belonged to "her" or "him" were disputed. Defendant also told Durison that he was worried about their mutual friend, Clark, providing information to police. Durison's credibility was called into question when the jury heard evidence of his prior convictions for theft and when the jury was made aware of inconsistencies in his testimony. Defense counsel questioned Durison about his prior statement to police in which he said Defendant and Evans killed Coco to get Coco's money.

In his brief, Defendant asserts that Durison's story was not "taken very seriously," as evidenced by the fact that it did not lead to his "arrest or even questioning, even if he was added to the growing list of suspects." Durison testified that he reported the conversation to police in 2011, and Defendant was arrested in

---

[14]The jury was not informed that the conversation took place while Defendant and Durison were in jail based on an agreement between the State and defense counsel.

2019. Defendant argues Durison's memory was "fuzzy and faded" on the details of the conversation, and Durison had a history of drug use.

In addressing Defendant's argument that the police did not believe any of the witnesses to whom Defendant confessed because the police did not immediately issue an arrest warrant, the State contends the APD surmised more evidence implicating Defendant would be discovered later. The State argues in its brief that Durison's testimony was corroborated by the following:

(1) Lace Evans, Courtney's sister, was dating Burns at the time of the homicide and dated him for 6 years;

(2) Burns was not home the weekend of the homicide or the day the body was dumped;

(3) Courtney had a leopard print comforter on her bed which was missing when Lace and other family members went to Courtney's house after her murder to get her cats;

(4) Several years later, Lace saw an identical comforter at the defendant's mother['s] house;

(5) As previously noted, Dr. Brown opined that Courtney was murdered by asphyxiation, or "smothering" as Burns described to Durison;

(6) As previously noted, the body was in fact found dumped in Texas;

(7) Chris Clark was Burns' former boss and had been his friend for years, and was the father of a child with another person to whom Burns confessed—Charlene Goleman—in other words, Clark was in a position to have information damaging to Burns, something Durison could not possibly know absent either Burns or Clark telling him;

(8) While he denied making the statement, Shamus Setliff told his ex-wife that Burns killed Courtney and Burns' mother washed the blanket. Under our law, the jury was entitled to believe the statement he gave to Tiffany Cedars, his ex-wife.

(citations omitted) (footnotes omitted).

The State argues that "[w]hile the court may form its own opinion of the weight to be given Durison's testimony, it can hardly be said based on the record that the jury's acceptance of his testimony was irrational—even assuming it was accepted." The State claims the jury could have rejected Durison's testimony yet reasonably accepted the testimony of Goleman or Setliff to find Defendant guilty.

According to Goleman's testimony, Defendant made several statements regarding the Coco case in 2009 or 2010. Goleman testified these conversations occurred over the span of a few months and happened after Defendant had been drinking. Defendant did not say what part he played in Coco's death. Defendant said he, Veal, and Veal's cousin had sex with Coco at some point, but they used condoms so there would be no proof of it. Goleman also testified that Defendant admitted to choking Coco, but she said the choking was not during the alleged sex. Defendant told Goleman that Coco's body was wrapped in plastic and put in a warehouse in Winnie close to I-10. Goleman said a silver Mustang played some part in the murder.

In his brief, Defendant points out that Dr. Brown excluded choking and strangulation as the mechanism of death. Defendant argues there was no evidence establishing that he was friends or acquaintances with Veal or Veal's cousin which "would need to be assumed for this allegation to be true." Then, Defendant paints Veal as the possible perpetrator of Coco's murder. Defendant notes that Veal is currently imprisoned for committing a homicide and was identified by a witness as driving Coco's car on October 2, 2004 after she was presumed to have been killed. Defendant questions whether the police attempted to show witnesses in Houston a photographic lineup of Veal and his cousin to determine if they matched the descriptions of "Red" and his cousin.

The State argues in brief that Goleman's testimony was corroborated by the following:

(1) As previously discussed, the body was found near I-10;

(2) As noted previously, the body was found in an abandoned building;

(3) As noted previously, Dr. Brown opined that the victim was likely asphyxiated or could have been choked;

(4) Significantly, Clyde Griffin, who knew Courtney through Jackie Hampton also knew Courtney's car. Griffin spoke to Courtney at "the club" Friday, October 1. He saw someone he knew from the neighborhood during the day on Saturday, October 2nd, riding around in her car, and identified that person in a line-up. That person was Earnest Veal;

(5) Ina Laborde, Courtney's grandmother, noticed when cleaning Courtney's house after the murder that her shower curtain was missing;

(6) Shamus Setliff, a nefarious figure the State is convinced played some part in Courtney's murder and to whom Burns allegedly confessed, was friends with Burns since childhood. While Shamus will be dealt with later in this brief, his best friend, Billy Ahart, owned a Silver Mustang in 2004.

(citations omitted) (footnotes omitted).

As with all three of the witnesses who testified about Defendant's incriminating statements, the State argues that "[w]hile the court may form its own opinion of the weight to be given [Goleman's] testimony, it can hardly be said based on the record that the jury's acceptance of her testimony was irrational—even assuming it was accepted." The State claims the jury could have rejected Goleman's testimony yet reasonably accepted the testimony of Durison or Setliff to find Defendant guilty.

Next, and according to Setliff's testimony, Defendant called him on the phone the week after Coco's death and told him that "he'd done it." Setliff denied telling his ex-wife, Cedars, that Defendant told him that he used Coco's blanket to wrap her body. He denied telling Cedars that Defendant told him he and Evans "did it" and that Defendant's mother washed the blanket. Setliff said his work delivery route did not go as far as Winnie, despite his statement to the police in which he stated his route went through Winnie. He admitted to passing by the abandoned building where Coco's body was found three times the weekend of her disappearance. Setliff gave a different version every time he talked to the police. In his last statement, Setliff recanted his allegations against Defendant. Setliff's testimony was further undermined by Cedars' testimony. She indicated that she did not know where Setliff was the weekend of Coco's disappearance. When he got home, he smelled so bad that Cedars told him to wash his clothes in bleach and to take a shower. Cedars found a pair of panties that did not belong to her in the van. Cedars testified that Setliff's work delivery route went through Beaumont and Winnie. Cedars testified that Setliff told her Defendant and Lace "did it" for the money. Defendant's mother washed the blanket.

In his brief, Defendant avers the State's use of Setliff as a trial witness was "odd," given that the prosecutor referred to him as a "sorry excuse for a human being[.]" Defendant also observes that Setliff admitted to being in Winnie and driving by the abandoned building at least three times on the day Coco's body was found. Defendant claims Cedars' testimony indicating that Setliff told her Defendant and Evans "did it" for the money was improper impeachment and hearsay because "that specific allegation was not asked of or denied by Setliff."

The State argues that if there was any witness whose testimony was completely or partially rejected, it was Setliff's. The State remains confident that Setliff played some part in Coco's murder and details the trial testimony that connects Setliff. However, the State asserts it is not the appellate court's role to parse his testimony to determine if it is believable; rather, this court must view Setliff's testimony in the light most favorable to the State. Though the State does not address Defendant's claim that Cedars' testimony was improper, we note defense counsel did not lodge a contemporaneous objection to Cedars' testimony as improper impeachment or as hearsay. Consequently, defense counsel failed to preserve this issue for review. La.Code Crim.P. art. 841.

After addressing each witness, Defendant argues:

> The general details of each of the allegations, including that Courtney was found in Texas, were general knowledge by the time all of the statements were given to police. Additionally, Lace Evans is the witness that initially told police Courtney's comforter may be missing, which she almost certainly would have mentioned to Anthony, her fiancé. Thus, even if Anthony knew this fact and told someone else, it is not necessarily a fact that *only* the murderer would know.

(citation omitted).

Here, the evidence presented at trial was overwhelmingly, if not entirely, circumstantial, due in part to the advanced stage of decomposition of Coco's body when it was examined. Louisiana Revised Statutes 15:438 does not establish a stricter standard of review than the more general rational juror's reasonable doubt formula enunciated by *Jackson*, *Id.,* rather the circumstantial evidence rule serves as a helpful evidentiary guide for jurors. *State v. Major*, 03-3522 (La. 12/1/04), 888 So.2d 798. Importantly, the due process standard in *Jackson* does not allow a jury to speculate on the probabilities of guilt where rational jurors would necessarily entertain reasonable doubt. *Mussall*, 523 So.2d at 1311. The requirement that

jurors reasonably reject the hypothesis of innocence advanced by the defendant in a case of circumstantial evidence presupposes that a rational rejection of that hypothesis is based on the evidence presented, not mere speculation. *State v. Quinn*, 19-647 (La. 9/9/20), 340 So.3d 829, (per curiam) (citing *State v. Schwander*, 345 So.2d 1173, 1175 (La.1977)), *cert. denied*, ___ U.S. ___, 141 S.Ct. 1406 (2021).

*Hypothesis of Innocence/Motive*

Though Defendant acknowledges the State is not required to prove motive, he disputes the State's theory of motive, arguing there was no coherent theory which explained why he would inexplicitly kill his fiancée's sister. He raises issue with the State's speculation that he and Coco were involved in a secret affair "based only on the unsubstantiated testimony of her sister, Lace Evans." According to Defendant, the State presented every hypothetical situation imaginable, including that Defendant was having an affair with Coco, that Defendant wanted to have an affair with Coco but was rejected, that Coco gave Defendant a sexually transmitted disease, and that Defendant and two other men had sex with Coco at the same time. He then questions the reasonableness of each theory, concluding: "None of the theories logically made sense or matched the known evidence."

The State correctly argues that motive is not an element of second degree murder to be proven beyond a reasonable doubt. "The state is not obligated to prove that the accused had a cause or reason to commit the crime of second degree murder; it is required to prove that the accused had the 'specific intent' to commit the crime." *State v. Johnson,* 324 So.2d 349, 353 (La.1975) (footnote omitted).

In *State v. Mire,* 14-435 (La.App. 3 Cir. 10/8/14), 149 So.3d 981, *rev'd,* 14-2295 (La. 1/27/16), 269 So.3d 698 (per curiam), this court reversed Mire's conviction after finding the State failed to exclude every reasonable doubt that Mire had the specific intent to kill the victim. The supreme court reversed, reasoning:

> The lynchpin of the court of appeal's analysis was its determination that the state failed to establish a clear motive for the killing. *See generally State v. Mart,* 352 So.2d 678, 681 (La.1977) (finding "that a lack of motive may properly be considered as a circumstance mitigating against specific intent"). The court of appeal erred here in two aspects. First, the state, in fact, presented abundant evidence of motive in the form of witnesses who described the various disagreements and, at times, acrimonious relationship between defendant and victim over the years. As the dissent correctly noted, *Mire,* 14–0435, pp. 1–2, 149 So.3d at 996–97 (Amy, J., dissenting), the jury was entitled to credit the state's witnesses in this regard and reject the defendant's disavowal of these potential motives within the confines of due process, which allows the trier of fact to make credibility determinations, within the bounds of rationality, and accept or reject the testimony of any witness; and thus, a reviewing court may impinge on the "fact finder's discretion only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). The court of appeal acknowledged and summarized the abundant evidence pertaining to potential motivations but then dismissed it all as providing poor and inadequate justification to commit murder. For example, the court of appeal opined:
>
> > Witness testimony did not establish a motive for Defendant to kill the victim. If Defendant shot the victim over unpaid money, he would not have left $527.00 in the victim's wallet. If Defendant wanted the fishing contract to himself, he would require significant help to provide ten thousand pounds of fish per week. The motives suggested by the witnesses simply do not make sense.
>
> *Mire,* 14–0435, p. 17, 149 So.3d at 991. However, the fact a defendant's motivations to commit murder are not objectively reasonable does not render the jury's determination he harbored these motivations and acted on them irrational. The court of appeal erred in substituting its appreciation of the evidence regarding defendant's motive for that of the jury, and thus failed to correctly apply the due

process standard of *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

*Mire*, 269 So.3d at 700–01 (footnote omitted). *See also State v. Trahan*, 11-1609 (La. 7/2/12), 97 So.3d 994 (per curiam). Thus, the question of whether the State's theory of his motivation to kill Coco was reasonable is of no consequence as long as the State proved that Defendant killed her with specific intent to kill or to inflict great bodily harm.

In the present case, Defendant's hypothesis of innocence is that someone else killed Coco, which is the same argument presented to the jury at trial. Considering *Captville*, 448 So.2d 676, and Defendant's failure to raise any new hypotheses, Defendant's argument fails because we find it was reasonable for the jury to reject his claim.

## CONCLUSION

In Defendant's appeal of his conviction of second-degree murder of Courtney Coco, he asserts the evidence submitted to the jury was insufficient to prove him guilty of second degree murder; and alternatively, if a homicide was committed that there was insufficient evidence he committed it. As previously stated, the jury was confronted with contradictory and conflicting testimony and evidence, and was, consequently, called upon to resolve several factual disputes. Viewing the evidence presented in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt that David Anthony Burns was guilty of second-degree murder of Courtney Coco.

## DECREE

For the foregoing reasons, David Anthony Burn's conviction and sentence is affirmed.

**CONVICTION AND SENTENCE AFFIRMED.**